Filed 1/22/26  In re D.A. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re D.A. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH & HUMAN SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>E.A.,<br><br>    Defendant and Appellant. | D086788<br><br>(Super. Ct. No. EJ4910A–D) |

APPEAL from an order of the Superior Court of San Diego County, Gary M. Bubis, Judge.  Affirmed.

Suzanne Davidson, under appointment by the Court of Appeal, for Defendant and Appellant.

David J. Smith, County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel, and Evangelina Woo, Deputy County Counsel for Plaintiff and Respondent.

On September 10, 2025, the juvenile court held a pretrial status conference to address the San Diego County Health and Human Services Agency's (the Agency) petition under Welfare and Institutions Code[1] section 388. E.A. (Mother) and Z.T. (Father)[2] share four boys. They had been living with Mother after the Agency became involved due to the parents' alcohol abuse and domestic violence altercations. But after H.A., Mother's two-month-old daughter from a different relationship, suffered near-fatal injuries, the Agency removed the boys from Mother's care and placed them with Father. At the section 388 hearing, the juvenile court terminated jurisdiction and gave sole legal and physical custody to Father. It ordered Mother's visits to be supervised by paternal grandmother, an agreed-upon third party, or a professional monitor, paid for by Mother. The court denied Mother's request to authorize Father to supervise her visits.

Mother appeals the custody and visitation order to the extent the court declined to allow Father to supervise visits. She contends the court's order effectively limits her ability to visit with the boys because she cannot afford a professional monitor, she lacks support from friends and family, and her relationship with the paternal grandmother is strained. The Agency responds that the juvenile court acted within its discretion, given the history of domestic violence between the parents and Mother's dishonesty and lack of insight throughout the case. We agree and affirm the order.

---

[1]     Further undesignated statutory references are to the Welfare and Institutions Code.

[2]     Father is not a party to this appeal.

# I. FACTUAL AND PROCEDURAL BACKGROUND[3]

A.    *Family History*

Mother and Father started dating when she was 11 or 12. Paternal grandmother pursued legal custody of Mother when she was 15, and Mother moved to San Diego to live with Father and paternal grandmother. The couple are parents to four boys, D.A., Z.T., E.T., and J.T.

In 2019, Father drove while intoxicated and crashed his vehicle with four-year-old E.T. inside. Father was arrested for driving under the influence (DUI).

In 2021, a paternal aunt called law enforcement because Father and Mother were extremely intoxicated and had engaged in domestic violence in her home. Father told responding officers Mother pulled his ear while yelling at him, causing a laceration to the back of his ear. Mother initially claimed she had caused a red mark on her arm but, after being arrested, said Father bit her, which is why she dragged him by his ear. Z.T., who was in the room, said Father was on the ground and Mother was "beating on him." E.T. was in the room and covered his ears during the incident, while D.A. only heard it from the other room.

Father called the police in June 2022 and reported that Mother was intoxicated and trying to gain access to the paternal aunt's home to take the children home. Mother told responding officers that Father punched her in the face, causing a laceration on her lip, in the presence of all four boys and their teenage uncle.

---

[3]    Our summary of the facts and procedural history is limited to provide context relevant to the single issue presented in this appeal.

B.      *Evidence Supporting the Original Section 300 Petition*

On October 17, 2023, Father was under the influence of alcohol and threw objects, ripped the front security door from the door frame, and slapped Mother in the face twice while she was holding J.T.  Father reported that he was so intoxicated that he "blacked out" and experienced memory loss, and law enforcement smelled alcohol on Mother's person.  Mother reported that she handed J.T. to D.A. before Father slapped her again.  Officers arrested Father.

When interviewed by the Agency, Mother said she and Father usually shared a pint of vodka twice a week.  Father stated that they drank five out of seven days per week, and admitted he was on probation and had a warrant out for his arrest because he failed to complete classes following his DUI.

The Agency filed petitions on the boys' behalf under section 300, subdivision (b) alleging the parents' violent altercations and substance use placed the children at substantial risk of serious physical injury.  At the detention hearing, the juvenile court removed the children from Father's physical custody and ordered them detained with Mother in the paternal grandmother's home on the condition that Father stay out of the home.

C.      *Activity Prior to the Contested Jurisdictional and Dispositional Hearing*

Mother acknowledged being both the perpetrator and victim of domestic violence in the relationship with Father.  She initially refused to participate in domestic violence classes because she had completed them in the past but then changed her mind because she heard it would "look good for the judge" to see that she did the classes.  She planned to remain in the relationship with Father because, as she stated to a social worker, "we're such a happy family when alcohol is not involved."

4

Mother engaged in parenting and treatment programs at ParentCare and said she was not drinking alcohol. However, she tested positive for alcohol three times in December 2023. On the second occasion, an investigator for minors' counsel observed her to be under the influence during a home visit. Mother initially attributed it to cold medication but then admitted she had been drinking beer.

Although the court had ordered Mother not to supervise any contact between Father and the children, the Agency learned that Mother, the children, and paternal relatives all met up with Father at a holiday event called "December Nights" and then went to a museum together. Mother also acknowledged Father had dropped off milk at the house a few times.

Father tested positive for alcohol and methamphetamine upon his admission to a treatment program in December 2023. His attendance at the program was "spotty" at first, but then he began attending almost every session. Father told his treatment counselor his January 26, 2024 test would be positive for alcohol.

At the contested jurisdictional and dispositional hearing on February 2, 2024, the court sustained the petitions and assumed jurisdiction. It ordered continued placement with Mother with supervised visitation for Father so long as Mother did not supervise.

D.   *Family Maintenance and the Section 364 Review Hearing*

The Agency's July 2024 reports reflect Mother's statements that she was in a new relationship (with a man subsequently identified as Chase A.) and 12 weeks pregnant with her new partner's child. She said paternal grandmother had asked her to move out, in part due to her pregnancy. Mother explained that she had "felt like she was walking on eggshells" and had "bad memories of the home." But she had nearly finished her domestic

5

violence and parenting classes and had tested negative for alcohol save for one lapse in February. Mother's domestic violence provider nonetheless recommended additional sessions as she did not believe Mother realized how her pregnancy affected her children or was grasping the information she was being taught.

Father meanwhile had fully participated in all the services offered by his rehabilitation center since April 2024 and had tested negative during weekly tests. Although he had not engaged in a domestic violence perpetrators group or parenting classes, he had consistently visited with the children.

Although the Agency had recommended terminating jurisdiction in its July 2024 report, it changed its recommendation in September following Chase's report that Mother was involved in a relationship with Father again and had been drinking throughout most of her pregnancy. Mother denied the relationship and claimed she only told Chase that story so he would "leave her alone." She acknowledged she saw Father when he loaded items into her car, but said she and Father had a positive co-parenting relationship. The social worker reiterated the Agency's expectations regarding her interactions with Father and recommended continued monitoring due to the Agency's concerns that the parents had been spending time together with the children present.

Based on the change in recommendation, the court set a family maintenance review hearing for March 2025. Mother gave birth to H.A., her daughter with Chase, in late January 2025.

In March 2025, the Agency again recommended leaving the boys in Mother's care and terminating jurisdiction. Mother's domestic violence provider stated that Mother had been able to positively co-parent and set

boundaries with Father, although she also noted Mother had low motivation to discuss protective issues. Her ParentCare counselor felt Mother had demonstrated she was able to protect her children and set boundaries with Father. Meanwhile, the Agency's understanding as to Father was that he had progressed to unsupervised weekend visits and two overnight stays per week.

E.    *Sections 342 and 300, Subdivision (j) Petition*

On April 1, 2025, the Child Abuse Hotline received a referral indicating Mother was bathing two-month-old H.A. when the baby slipped out of her hands and hit her head. H.A. turned blue, and Mother called 911. Mother alternatively stated that she tripped while holding the baby, causing her to hit her head. Separately, Chase told a detective that H.A. spit up on him, so he went to bathe her. As he was getting into the bathtub of water, he had a back spasm and fell, resulting in H.A. hitting her head on the side of the bathtub. E.T. was home at the time but did not observe the incident. The only thing Mother recalled when talking to a social worker the next day was the water running. An officer investigating the scene found no evidence of water inside the bathtub.

The Child Protection Team doctor, Dr. Shalon Nienow, stated that H.A. was dead when first responders arrived and had to be resuscitated. As a result, her case was considered a near fatality. H.A. had no brain activity the next day and was not responding to pain. Initial x-rays showed healing rib fractures and new head injuries, and Dr. Nienow concluded H.A.'s injuries were due to child abuse on different occasions. She explained that rib fractures generally are due to direct trauma or compression of the ribs, and the head injuries resulted from H.A. either being repeatedly slammed or shaken and then slammed. In her view, Chase's story about H.A. hitting her

7

head on the side of the bathtub did not explain H.A.'s injuries. Subsequent assessments revealed multiple hemorrhages near the brain and spinal cord, skull fractures, spinal ligament injuries, numerous rib fractures, and a broken leg. If she survived, Dr. Nienow did not expect H.A. to have any quality of life.

Mother told the detective she had seen Chase be rough with H.A. when he swaddled her and when he forcefully spread her legs and pushed her knees up to try to get the baby to pass gas. She had not confronted Chase about his conduct. She also reported that Chase requested to be alone daily with H.A. for parenting time and that she would hear H.A. crying from outside the bedroom door. She had noticed bruises on H.A.'s cheek and leg, but believed Chase's explanation that H.A. must have slept with her face on her pacifier and hurt her leg on the car seat. Although she claimed Chase did not live in her home, she said he slept there seven nights per week.

Chase maintained that he and Mother were the only ones who provided care for H.A. and that the older boys did not play roughly with her.

Given how severely H.A. was abused, the Agency removed the boys out of concern they were at risk for physical abuse in Mother's home. The Agency placed the children in Father's care and filed petitions under section 342. The court sustained the petitions, removed the boys from Mother's care, placed them with Father, and ordered supervised visitation with Mother.

F.     *Termination of Jurisdiction and Exit Orders*

During an interview with a social worker, Mother described Chase as "controlling." She said he prevented her from talking to certain people, including her friends from Alcoholics Anonymous, and tracked her on her phone. He also installed cameras inside and outside the house to watch her

8

and "make sure [she] didn't bring anybody in the house that [she] wasn't supposed to."

Mother claims February 10, 2024, as her sober date, but texted a social worker on April 23, 2025, to say she would fail a drug test because she drank wine with Chase to celebrate his new job. She admitted she drank twice the prior month. Chase meanwhile acknowledged having two prior DUIs.

Chase told the social worker he mainly installed the cameras because Father had gone in their house once, and he said he was afraid for Mother. According to Chase, Father watched H.A. many times.

At the September 10, 2025 pretrial status conference, the court dismissed the section 342 petitions. It found by clear and convincing evidence that there had been a change in circumstances and removed the boys from Mother's custody. The court awarded Father sole legal and physical custody. Mother objected to the Agency's recommendation that she participate in a non-protective parenting group and requested Father be approved to supervise her visits with her sons. The Agency and counsel for J.T. and E.T. opposed Mother's requests. The court imposed the non-protective parenting group requirement and denied the request to have Father to supervise the visits. It explained that "[i]n an abundance of caution, based on the information in these reports and the seriousness of the case," it would not allow Father to supervise and "put the dad in harm's way and have these kids come back in over a [domestic violence] case." The court then terminated its jurisdiction.

## II. DISCUSSION

The only issue on appeal is whether the juvenile court abused its discretion in denying Mother's request for Father to supervise her visits. We conclude it did not.

9

A.    *Legal Principles and Standard of Review*

When the juvenile court terminates dependency jurisdiction, it may issue a custody and visitation order, often called an " 'exit order.' "  (§ 362.4, subd. (a); *In re T.S.* (2020) 52 Cal.App.5th 503, 513.)  The court has broad discretion when fashioning a custody and visitation order and focuses on the best interests of the child.  (See *In re T.S.*, at p. 514; *In re Nicholas H.* (2003) 112 Cal.App.4th 251, 265, fn. 4.)  This is because "[t]he juvenile court has a special responsibility to the child as *parens patriae* and must look to the totality of a child's circumstances when making decisions regarding the child."  (*In re Chantal S.* (1996) 13 Cal.4th 196, 201 (*Chantal S.*).)

We review a juvenile court's custody award pursuant to section 362.4 for abuse of discretion.  (*Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 300 (*Bridget A.*).)  " ' "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason.  When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' "  (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318–319.)

B.    *Analysis*

Although Mother argues the parents have co-parented well over the last two years and refrained from engaging in domestic violence, the court appropriately looked at the totality of the circumstances in assessing what was in the boys' best interest.  (See *Chantal S., supra*, 13 Cal.4th at p. 201.)  The children were removed from Mother's care following life-threatening abuse of H.A.  Even if the evidence ultimately demonstrates that Chase inflicted the abuse, Mother's failure to intervene when Chase was rough with H.A. and when she heard H.A. repeatedly crying during his alone time with her demonstrates her lack of protective parenting instincts.

10

Mother's actions after observing other "red flags" in Chase's behavior also establish she had not learned to make protective decisions for her children. Mother had disclosed to the Agency that Chase stalked her during her pregnancy and said that she was not in a relationship with him and had considered obtaining a restraining order. But she did not obtain a restraining order. Instead, even though he threatened to take H.A. away from her and lock her up, she reunited with him, and H.A. ultimately suffered the consequences. She continued to live with Chase despite controlling behavior such as tracking her cell phone, isolating her from her sober friends, and installing cameras in the house to monitor her. And she coached the children not to tell anyone from the Agency that he lived with them. She also did not disclose her relationship with Chase to her domestic violence group after the provider pointed out that she "was pregnant and didn't learn [her] lesson." Yet she nonetheless actively resisted a court order requiring her to participate in a non-protective parenting group.

Her counsel below argued the orders should be based only on the original petition and that there was no evidence she had failed to protect the boys. But evidence did, in fact, show that Mother's prior conduct put the boys at risk and that she had not fully modified her conduct or gained insight into how it affected her sons. She had repeatedly gotten back together with Father, engaged in domestic violence with him near the children, and not been forthcoming with the Agency about her actions. The present case in fact arose because the parents relapsed into alcohol use and domestic violence after previous involvement with the Agency and drug dependency court. Despite completing 30 group sessions targeted at learning about domestic violence, she did not address the necessary issues, as evidenced by the provider's statement that there was "no evidence that adding more group

11

sessions would benefit [Mother] as her motivation to discuss the protective issues was low."

Although the same domestic violence provider indicated in September 2024 that Mother had demonstrated she was able to set boundaries with Father, the court could reasonably question Mother's veracity. She saw Father twice in August 2024, despite the Agency's concerns about her being around him, and apparently had not disclosed to the Agency that the two older boys were living with Father in April 2025. As recently as during her pregnancy with H.A., Mother said she was "still in love with [Father]." According to Chase, Father drove Mother home from the hospital after she gave birth to H.A., and she reportedly argued with him in the car. Given the prolonged and recent record of Mother engaging with Father when she was not supposed to and her continued feelings for him, it was reasonable for the court to conclude it was not in her sons' best interest to allow the parents to spend more time together. It would also be reasonable for the court to be concerned about allowing the boys to be with Mother and Father jointly when Mother had not effectively cut ties with her controlling, possessive boyfriend.

Additionally, Mother has not maintained her sobriety or been entirely forthcoming about her drinking. Earlier in the case, she had multiple relapses and did not disclose any of them until she was either caught by minors' counsel's investigator or randomly drug tested. Despite initially claiming a sober date of February 19, 2024, when asked to take a hair follicle test, Mother admitted drinking wine with Chase as recently as March 2025. Chase and his sister also both said she drank during her pregnancy with H.A. As the parents had a history of drinking together and alcohol abuse had been a significant factor in triggering the domestic violence between Mother and

12

Father, the prospect of Mother being intoxicated while Father was supervising visits with the boys was a justifiable concern. It put Father's sobriety, and potentially his ongoing probation, in jeopardy and increased the likelihood of the parents again relapsing into domestic violence. The court could reasonably conclude it was in the boys' best interest to remain in a stable home with a sober parent and that authorizing Father and Mother to be together regularly put these interests at risk. Contrary to Mother's view, these risks would exist regardless of whether Father supervised Mother's visits in a public or private setting.

Mother contends D.A., Z.T., and E.T. (ages 14, 12, and 10 at the time of the appealed order), were old enough to report any issues while Father supervised Mother's visits and to protect themselves, if necessary, from the parents. However, the children had previously minimized and denied their parents' domestic violence. Z.T. told law enforcement he saw Father lying on the ground and Mother "beating on him" during an incident in 2021. In 2022, Mother told law enforcement Father had punched her in the face, causing a laceration on her lip. All four boys were reportedly present when the incident occurred. But Z.T. and E.T. later told a social worker the parents only yelled; they had not seen the parents hit each other. D.A. said he had seen the parents use their hands when fighting "maybe once," and said they probably just slapped each other "mostly [on] the arm." Furthermore, when children have been brought under the jurisdiction of the juvenile court to protect their safety (§ 202, subd. (a) ["The purpose of this chapter is to provide for the protection and safety of . . . each minor under the jurisdiction of the juvenile court"]), it is not appropriate to terminate jurisdiction and impose visitation conditions that simply require the minors to ensure their own safety. Therefore, the juvenile court fairly concluded it was in the children's best

interest to avoid a situation where they might be called upon to protect themselves.

Finally, we are not persuaded by Mother's assertion that the court effectively denied her visitation with her children because she had no other viable options for supervision. Mother states that she cannot afford a professional supervisor, but she relies only on her family court attorney's statement for this assertion. "[U]nsworn statements of counsel are not evidence." (*In re Zeth S.* (2003) 31 Cal.4th 396, 413, fn. 11.) Although Mother was unemployed as of June 2025, she indicated at the time that the social worker's suggestion of getting a part-time job was "a good idea." There is no indication she subsequently tried but failed to obtain employment. And while she claims she is not on good terms with the paternal grandmother, there is no evidence the paternal grandmother, who has been her own maternal figure since age 15, expressly refused to supervise visits. Nor does the record indicate she and Father discussed other potential third-party supervisors and could not reach an agreement.

In sum, the juvenile court did not exceed the bounds of reason in concluding it was not in the boys' best interest for Father to supervise Mother's visits. Accordingly, we conclude the juvenile court's exit order was not an abuse of discretion. (See *Bridget A., supra*, 148 Cal.App.4th at p. 300.)

## III.  DISPOSITION

The order is affirmed.


McCONNELL, P. J.

WE CONCUR:


DO, J.


RUBIN, J.